Morning, Your Honor. May it please the Court, Alan Schoenfeld for the appellant. The principal question in this appeal is whether a reasonable jury could conclude that Leo D'Andrea was suspended and his professional responsibilities materially impaired because he gave two testimony in two coworkers' discrimination cases. The government and D'Andrea each presented credible explanations for what transpired here. The District Court I want to talk to you about that because it's credible. You've characterized the investigation into D'Andrea for drawing a gun on somebody outside of an airport as a dormant investigation. Correct, Your Honor. Looking at this record, it was not clear to me how that characterization could be made. Sure. The incident took place in April of 2007. There was one contact between Mr. D'Andrea and the government in November of 2007. Nothing else happened until April 22, 2008, when the matter was referred from D.C. back to JFK. That is exactly the same time that a subpoena was issued. When was he interviewed? He was interviewed in November of 2007. Okay. So that happened, right? Correct. So what would lead someone to conclude that, yeah, they interviewed, but this is going no place. They're not going to finish this. It just ended. There was a three-month gap between the incident, which the government now claims was so objectively concerning that it's apparent from its face that it was motivated purely by the government's concern for what had happened. There's then another gap of six months in time between the interview and a notation in the record at page A147 that concerns had arisen that required further investigation. In your experience, how long do these investigations normally take? I don't think there's evidence in the record to suggest how long it takes. What matters for purpose— What do you think, as a matter of law, would be sufficient? I'm not sure there is a matter of law here. What I would point Your Honor to is the fact that this investigation was not returned to New York for further investigation, and it didn't actually pick up any meaningful speed until he was served with a subpoena to participate in a colleague's EEO case. That sort of temporal proximity, we're not talking a matter of months. We're talking a matter of days. He receives the subpoena through the office of legal counsel within the department. The next day, he is dragged into a supervisor's office for a hostile meeting. And the week after that, the investigation proceeds in earnest. May 2nd, May 6th, May 9th, there are investigations. But for the subpoena, this investigation, just nothing ever would have happened after that, you think? It would have just ended. I think a jury is entitled to hear the evidence and determine whether the government's avid pursuit of this investigation, only upon receipt of the subpoena to participate in an EEO case, together with the other evidence— I think you have a little more argument, don't you, that the government thought so little of this incident at the airport that they didn't appoint an investigator until September to investigate. That's certainly right. I think the chronology here is— Well, there was the event, and there was the appointment of the investigator in September. I guess this event was, what, in April or May or March? Correct. The event was in April 2007. An investigator is appointed for the first time in September. There is— And there's the interview in November. Correct. And then nothing, nothing between November and the exact same time that he receives a subpoena from OPLA to testify in this EEO case. Why would receiving a subpoena trigger retaliatory animus? So I don't—I'll answer your question. It's not—unless there's evidence that he asked for a subpoena. So he gets served with a subpoena. Why would he be punished for that? The testimony from Mr. D'Andrea's supervisor is that there is a cultural understanding in the office that whenever you hear the word EEO, you look the other way. A jury could hear that evidence together with the receipt of the subpoena. My question is, why does being served with a subpoena suddenly get everyone upset at you? I mean, all you did was get served. Understood. But Mr. D'Andrea was known to be an ally of Mr. Walia, the person in whose case he would be testifying. There's a pervasive climate within the office disparaging participation in EEO cases generally. The temporal proximity—and also, Judge Chin, I don't think the government disputes that his conduct was protected activity. Your question may ultimately go to a question of causation for the jury to resolve whether that event is of the type that would trigger the type of retaliatory conduct. What is the evidence of causation here? The evidence of causation is the temporal proximity between the receipt of the subpoena, picking up steam on the investigation, an investigation that, in Mr. D'Andrea's submission— When did the adverse action take place? So there are two. With respect to this, the 2008 subpoena— Well over a year after the purported protected activity, right? I disagree, Your Honor. So, and I think this— What is it? I think it's the investigation itself. And we point to cases where this Court has recognized the investigation itself can be an adverse employment action. And then it's the fact that this investigation, which, again, Mr. D'Andrea says was flawed, eventuated in his termination in 2010—or, sorry, his suspension in 2010. So the government urges that this Court consider the temporal proximity between receipt of the subpoena in April of 2008 and his suspension in 2010. I think that misconstrues both the submission and the record. There was an investigation that lay essentially dormant for a year and only picked up steam upon receipt of the subpoena. When you say picked up steam, what happened? There were, in the space of days between the receipt of the subpoena and the hostile meeting at OPLA, there were, I think, three or four investigations in the first week of May. There were multiple— There were many investigations. I'm sorry. Interviews. Interviews. Multiple interviews with witnesses, with Mr. D'Andrea again. There were interviews on May 2nd. May 5th is when D'Andrea testifies in WALIA. And in May and June, there are investigation—or, sorry, interviews on May 9th, May 15th, June 12th, June 26th, and a request for video footage of the incident on May 14th. If this incident was so objectively concerning to the government, why request the video footage 13 months after it took place? During this time period, the three years between the incident and his suspension, he is walking around with his badge, carrying a gun. And yet the government now claims that a jury couldn't even get this question because it is so objectively clear from the record that this was a dangerous incident that required his suspension. Well, I mean, are you disputing that it was a dangerous incident? Mr. D'Andrea certainly disputes the government's conclusions with respect to that incident. But the facts of the incident are that he was found outside of a terminal at JFK with his gun drawn aimed at two civilians in a car whom he had basically followed into the airport. So let me answer that question in two ways, Judge Sullivan. The first one is, Mr. D'Andrea says that he was threatened by the individuals in the car and that he drew his gun in response because he felt threatened.  But more importantly, the government submits that incident as a legitimate non-retaliatory justification. At summary judgment, the court is required to accept that that thing took place and accept that that thing is a legitimate justification. There are many cases from this court where the court accepts it. Even if he felt threatened, I mean, there's no dispute he pulled his gun outside the terminal and aimed it at civilians, right? Correct. And even assuming he felt threatened and that was his reason to do it, isn't that something that warrants investigation? That is something that the government can submit as a legitimate non-retaliatory justification, but even so, the jury gets the question of causation. But there was no investigation. I think that's absolutely right. But more directly to Judge Chinn, I think it's irrelevant for the procedural status of this case. They submitted this as a legitimate non-retaliatory explanation. I don't think it's irrelevant. I mean, you know, it may not carry the day, but you, even though there's some evidence on that side, there still has to be enough to support a jury verdict. So I don't believe it. Absolutely. There was one other factual element. This is a heavy factual case here, and the investigator troubled me a little bit. In the investigation itself, they didn't investigate everybody. There were some investigators who would have said that there was a culture of retaliation or anti-EOC culture. Correct. They were not called to the investigation. So Supervisor Mulhall, who was Mr. D'Andrea's supervisor, was his third supervisor, testified, and he's the one who testified that there was a climate of ---- Was he a supervisor at the time of the original incident? You're thinking, I think, of the Supervisor Swayatocha, who Mr. D'Andrea called from the site and accompanied him to the Office of Professional Responsibility to address the incident at JFK. Swayatocha was not investigated, and that's part of why Mr. D'Andrea submits, that the investigation itself was faulty, that the conclusion it reached was faulty, and also why the investigation itself was an adverse employment action. I see my time is up. I just want to make sure I'm clear on the timeline. The incident happens in April of 2007. By November of 2007, Mr. D'Andrea is interviewed about that incident, and then shortly after that, he also then submits an affidavit about what happened. It's at the same time. I think the affidavit came out of the interview. Well, right. He signs an affidavit after that. So it took six months for that to happen, and then six months later, the investigation then kicks up, right? Again. Correct. And you're saying that the inference to be drawn is that the investigation was dormant and nothing would have happened but for the fact that he was served with a subpoena. I think the inference for the jury to draw from the evidence, or that a reasonable jury could draw from the evidence. But the question is, is that really meaningful, what you've just said? Yes. I think that the receipt of the subpoena, there's no dispute that the receipt of the subpoena is protected activity. So as to the question of causation, is the receipt of the subpoena, where I think the expectation is that he will testify. Is there any evidence to suggest that they were unhappy that he received a subpoena? Not. I don't think there's any evidence in the record that at the time he received the subpoena, any specific displeasure was communicated. There's evidence in the record, however, of an atmosphere that disfavors participation in EEO cases. Your argument would be that this was like a warning shot to him. You know, you better not, it would be better if you dropped this. And that's precisely what he says happened to him. There was a meeting the day after he received the subpoena where Mr. Opiola slams his hand on the table, is hostile towards him. Mr. D'Andrea says, is this about the subpoena? And Mr. Opiola refuses to answer. So Mr. D'Andrea's testimony is there was immediate blowback based on his receipt of the subpoena. Is there any evidence that they knew that he had received a subpoena? There's no specific evidence that Mr. Opiola did. Well, he mentioned it. He mentioned it, apparently. I think that's right, Your Honor. Is there any evidence that his supervisors knew that he had been served with a subpoena? I don't think there's specific evidence about that, but can I make one more point about that before I? I don't want to. Sure. You're way over. You have some time for rebuttal. Let's hear from the government. Good morning, Your Honors. May it please the Court. My name is Stephen Cha-Kim. I'm an assistant U.S. attorney in the Southern District of New York. I represent the government that defended Napoli, as I did before the district court in the proceedings below. This Court should affirm the grant of summary judgment in favor of the government because the plaintiff, at every step of the relevant McDonnell-Douglas burden-shifting framework, has failed to meet his minimal burden of proving a prima facie case of retaliation and of hostile work environment. Leave the hostile work environment out of it because that's a separate question. And, in fact, it doesn't seem that the district court really spent much time on that. In fact, I don't think any time on it. So that's another question. It was discussed and did by the district court. But in terms of this case, this situation here, as I understand the argument that's being made by the other side is that this was kind of a pro forma routine, you know, we got to get rid of this case kind of situation. They appointed an investigator several months afterwards. Then later on, months later, there's an interview and an affidavit. And then at that point, nothing happens until the subpoena occurs. And then at that point, that's where the case, from their perspective, begins. And then the investigation kicks off. There are all these interviews, but they leave out some people that are some interviewers that are going to, his direct supervisors, actually, which is sort of odd, that might give testimony that's unfavorable to the investigators in terms of having to predetermine how they want to come out on this. So that's where I'd like you to focus. Gershengorn Certainly, Your Honor. And I think there's two parts to that, which is first, the timing, and then second, the supposed evidence of the fact that it was a defective investigation. First, as to the timing, as much as plaintiff tries to suggest there's a genuine issue of fact here, as the panel was indicating earlier, the record belies that. There is an objectively serious incident at JFK Airport in April 2007 in which Port Authority police officers, not affiliated with the government at all, have to respond to an incident in which the plaintiff has his gun drawn on two individuals. The terminal gets shut down for a number of hours. Scalia I understood. But then where's the investigation after that? Nothing happens until the subpoena occurs. Gershengorn Certainly. So the plaintiff himself says in his deposition and his complaint that he reports the incident. And then it's the record shows that the report, the incident is immediately referred to OPR, the Office of Professional Responsibility. The record then shows that. Sotomayor Given, and we've been over the facts, but could a reasonable jury find that the government really wasn't too concerned about this until Mr. D'Andrea received the subpoena? Gershengorn No reasonable jury can come to that conclusion. And part of that is the case then gets referred to the National Security Investigations Unit, which is a separate unit in the large agency that's based in D.C. An agent gets assigned to that, does a paper review of ---- Scalia The agent is assigned to it in September, months, almost six months later, right? Gershengorn Well, I would suggest, Your Honor ---- Scalia You may be talking about the slow wheels of bureaucracy here. I don't know. Breyer Well, the slow wheels predate the subpoena, right? Gershengorn Exactly. Scalia Yeah. Gershengorn So there's a ---- this incident takes four months after the initial referral to OPR to get sent to National Security Investigations. That agent looks at the file. Within a month or two, interviews Agent D'Andrea, also solicits sworn testimony from him in the form of an affidavit, processes that. That unit, still National Security Investigations, finds some minimum colorable complaint here, refers it back to the Office of Professional Responsibility in New York, and this is in April 2008, still predating the protected activity. And then that agent then solicits a further submission from Agent D'Andrea, which is made on May 2nd, again, prior to the protected activity. Scalia Well, no, no. When's the protected activity? Gershengorn The protected activity, and the government does not concede that the receipt of the subpoena is not a protected activity. His testifying on May, I believe, 8th, 2008, in the Eastern District before Judge Weinstein, that is what he's always said is a protected activity. That's what he says he told John Cianci, his supervisor, about. Scalia That's a very crucial distinction. Gershengorn When did he tell Cianci? Scalia Much of what your adversary is relying on predates that. Gershengorn Yes. Scalia And you're saying D'Andrea himself did not consider that to be a protected or the subpoena to be protected? Gershengorn No. Well, so it goes to the Court. Scalia Or is that just an argument that you're making? Gershengorn Before the district court, D'Andrea in his complaint said and in his deposition said even the act of referring that matter in April 2007 was an act of retaliation, which of course facially makes no sense since the protected activity didn't start until 2008. Now, and beyond that, they suggested that the act of testifying was protected activity, which the government purposes of the appeal doesn't contest. Now in an appeal, in an effort to try to move the window back, they say, no, actually, it's even receiving the subpoena in April 2008 that triggers it. But as I think Your Honors were suggesting earlier in your questioning, nothing inherent in the act of receiving a subpoena in an unidentified case qualifies per se as protected activity. Now, the plaintiff had the opportunity. Alito The argument is that there is this culture of any time the word EEO is mentioned and therefore the receipt of the subpoena somehow triggers this animus. Gershengorn And I'm glad Your Honor brought that up, because that quote from Agent Mulhall's deposition, if you look at the words of that, of what he's saying, any time you hear EEO activity we don't want to hear, they're construing that to mean a jury could even read that to mean therefore we retaliate. But if you, first of all, Mulhall made that, Mulhall became Dandrea's supervisor in 2010, two supervisors and two years after all this happened. Yet they're hanging their hat on his, this statement supposedly is direct evidence of a culture of retaliation. He made that answer in the context of questioning about did you know about Agent Dandrea's complaint? And he gave an answer that said, you know, no, I didn't. And in fact, any time EEO is said to a supervisor, we don't want to hear about it because we know that, you know, we're not supposed to know about it. Now, they're saying that a jury could somehow construe that to mean as an admission of a culture of retaliation. And we submit that if you look at that testimony, that is not a reasonable inference to be drawn from that testimony. I will also add that the other evidence of the supposed culture of retaliation is nothing but hearsay and generalized and conclusory statements, which, you know, as much as plaintiff would like to throw it up against the wall and say, hey, that's an issue for the jury, this Court has always said that it's insufficient to meet the burden that is the plaintiff's, that summary judgment, to show that this legitimate reason was illegitimate. The other complaint of act on appeal is D'Andrea being removed as lead agent from this one case. And that occurred in 2010, two years after any of the protected activity. Not only that, Mr. D'Andrea conceded as deposition that he had been spoken to two times about the very issue prior to this. He conceded that, and he says in his complaint, I wish I could have done it faster, but, hey, no one gets punished for this. But when specifically asked about this, he could not name a single individual for whom he had any kind of knowledge about whether a comparator that was similarly ---- Scalia, I think the other side's best argument, I'm not saying it's a winner, but their best argument is the claim of retaliatory investigation and the, followed by the suspension, which resulted from the investigation. That's the only issue that's troubled me, and I think it depends on how you view the evidence. And if D'Andrea himself is taking the position or took the position early on that was the testimony that was the protected event and not the subpoena, that's what they're arguing is a subpoena, receipt of the subpoena with the culture somehow as a protective event. But if D'Andrea himself did not rely on that earlier in the case, then that's, I think, significant. And I think it is, Your Honor. If I can add two things about that. One, to buttress that argument, they rely on this idea that the investigation was somehow defective on its face. But in reliance of that, all they do is cite to this declaration from Mr. Yagoda, who was a former supervisor, the sum and substance of which is, hey, I think he was discriminated against because I have exculpatory information. He doesn't say what that exculpatory information is. He wasn't there. The investigators over the course of not just these first year, but, and this goes to the point of the speed of bureaucratic investigations perhaps, but over a steady investigation over two to three years, each of the two individuals who were pulled over that day were interviewed in detail. And those notes are in the investigative file. Before you run out of time. Yes, sir. What do we do with the hostile environment claim, which the district court does not even mention, much less discuss? So I would argue, Your Honor, that the district court properly dismissed the hostile work environment claim as well because we're dealing with a retaliatory hostile work environment. So a hostile work environment claim is predicated on identifying a protected status or class under Title VII. In a retaliatory context, that means that you are subjected to. There's nothing done by the district court. Well, Your Honor, this Court. There are pieces of evidence there. You know, you would argue that they're minor. They're little petty slights that he had, the parking space and such. But how do we review it? Certainly. So this Court can. Does it have to go back for a finding on this point? It does not, Your Honor, because this Court has always said that it can affirm a grand summary judgment such as this on any basis evident from the record. And Your Honors have the full record in front of you. In fact, unusually you have all the deposition transcripts in this case in front of you. There's no discussion of the elements of a hostile work environment, whether there's severe pervasive conduct. We would have to be engaged. We would have to engage in that analysis in the first instance. Well, it is, but your review here is de novo, Your Honor, and you make that review. Why shouldn't we send it back and let the district judge do it? To be candid, it would be a waste of judicial resources and time, because what Judge Hellerstein did was he said there is no prima facie case of retaliation, that there is no evidence, even minimal, of a retaliatory motive. Ergo, how can a plaintiff then establish that he was subjected to a hostile work environment on the basis of retaliation if the district court thoroughly debunked that case on several layers of the prima facie case and on causation? Well, it's also the fact that in order to bring a hostile work environment claim, you have to establish that the conditions of employment were so altered by what was taking place as to effectively be another adverse action, right? Absolutely. And the only two adverse actions complained of before Your Honors is the investigation and the removal. Now, they can rely on the 25 other incidents that they relied on in the district court as background evidence, but none of that raises anywhere close to the level of a materially actionable incident. That's why Your Honors should have comfort or be secure in saying that you can review this, because everything that plaintiff can point to as the source of this hostile work environment is properly before you. And none of that, from complaining about having to work five days in a row, having to work early mornings on investigations, being criticized because he left a government car impounded and left on vacation instead of getting it out instead, all those which she claims are the incidents of hostile work environment, all clear on the record that it does not rise to the level of a minimal prima facie case. And I say that my time is up. Thank you. Thank you, Your Honor. I'd like to start where Mr. Chokhim finished, which is the district court's supposed conclusion that there was no prima facie case established here. The district court made two legal conclusions. The first, that there was no evidence of knowledge. And the second, that Mr. D'Andrea had failed to rebut the legitimate non-retaliatory justifications put forward by the government. Both of those legal holdings are indefensible under this Court's precedent. Gordon, 19 years ago, squarely forecloses both of those. There is no requirement to show knowledge beyond general corporate knowledge. And there are multiple ways of proving causation in a retaliation case. And while one of them is to disprove the legitimate non-retaliatory justification put forward by the defendant, that's not a requirement in any way. And yet the district court faulted Mr. D'Andrea for not doing that. And so I think in addition to not addressing the hostile work environment claim at all, the district court's reasoning doesn't even support the entry of judgment in favor of the government here. And so this Court would have to start from scratch on both claims in order to affirm. You agree that the Protected Act was the – are you still arguing that the Protected Act was the receipt of a subpoena? Paragraph 30 of the – sure. Paragraph 30 of the complaint under the heading of engaging in protected activity says – there are two sentences in the paragraph. It says he received the subpoena and he testified. I think it's – So he had a choice of not receiving the subpoena? I don't think he had a choice of not receiving the subpoena, but the expectation when someone receives the subpoena is that they're going to testify. It is prohibited to dissuade someone from testifying. And he testified within a – Oh, so – Sorry? That's not retaliation. That's certainly not retaliation. I guess what I'm – Retaliation can only be for the testimony. It's retaliated against for the testimony or the expected testimony. Are you asking which of the two he was – What happens first is he gets served with a subpoena. Correct. What happens eventually is he testifies. Correct. You're saying that something in between, I think, constituted his employers pressuring him or attempting to prevent him from testifying. Is that correct? No. I think they're retaliating against him for receiving the subpoena with the expectation that he'll participate by giving testimony. That's not a protected act. Does he have a choice not to testify once he's received a subpoena? I don't think so. So why does it make any sense at all? Why is it plausible that he's being retaliated against for receiving a subpoena that he's not free to ignore? Because the government – I mean, given the culture of disfavoring participation in EEO activity, he could go there, he could change his story. I don't know what's in the government's – Do you see anything in the record to suggest that he was encouraged to change his story or to otherwise not cooperate with the subpoena? I think the inference that the jury could draw is that given the climate of disfavoring participation in EEO cases, and I'd like to just mention that quickly, given the climate, engaging in retaliatory activity, such as this retaliatory investigation, is a way of dissuading people. Do you have any cases that set forth a doctrine of anticipatory retaliation before the act – before the protected act? I think – I worry that we're slicing things a little too fine here. I think that the conduct that he engaged in that elicited the retaliation was the receipt of a subpoena and his testifying, which is the necessary conclusion of participating – of receiving the subpoena. I think – Is there any case that recognizes that receiving a subpoena is protected activity? I'm not aware of one. This issue was also – Would you argue below that the receipt of the subpoena was the protected activity? I honestly couldn't tell you. I think that the argument below was that he received a subpoena and testified. He received a subpoena. I'm looking at paragraph 30. It's part of the sequence of events. I don't think I read that as saying the protected activity is receiving a subpoena. I understand that, but I think that the timeline here is sufficiently idiosyncratic that the receipt of the subpoena and the immediate testimony following it, given the resumption of this investigation within that very narrow space, and then the investigation. I mean, there were – the interviews that took place were after his testimony. Just to remind you of the sequence here, he gets the subpoena in late April 2008. We've been through the sequence. Okay. Why don't we finish up? Sure. So just to refer to the testimony about the climate, I would encourage the Court to look at the language of Mulhall's testimony in A653. I don't think the government is being fair to its treatment of that testimony. With respect to Norman and Yagoda, there is no requirement that evidence presented on summary judgment not be hearsay. It only needs to be presented in a form that could be admissible at trial. Norman could have been called as a witness. This Court has recognized that. The amendments to Rule 56 in 2015 explicitly recognize that. Yagoda gave first-person testimony, based on his experience in the Department, that he believed that this was retaliatory. Thank you, Your Honor.